*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

**Electronically Filed
Supreme Court
SCWC-16-0000319
01-MAY-2019
09:29 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

————————————————————————————————————

NATIONSTAR MORTGAGE LLC,
Respondent/Plaintiff-Appellee,

vs.

DANIEL KALEOALOHA KANAHELE and
THE ESTATE OF MARCUS C. KANAHELE et al.,
Petitioner/Defendant-Appellant.

————————————————————————————————————

SCWC-16-0000319

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-16-0000319; CIV. NO. 14-1-0584(2))

MAY 1, 2019

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY RECKTENWALD, C.J.

In 2006, Daniel Kaleoaloha Kanahele (Daniel) and his brother, Marcus C. Kanahele (Marcus), co-signed a mortgage on their property in order to obtain a $625,000 loan. While both brothers executed the mortgage, Daniel was the promissory note's

(Note) sole signatory.  Daniel defaulted on the loan in 2008, and in 2014, Nationstar Mortgage, LLC (Nationstar) initiated this foreclosure action.

After seventeen months of proceedings involving Daniel, Marcus's Estate, and Nationstar, the Circuit Court of the Second Circuit granted Nationstar's motion for summary judgment, and issued final judgment in favor of Nationstar.[1]  On appeal, the Intermediate Court of Appeals (ICA) vacated the judgment and remanded the case for further proceedings.  Although the ICA ruled in Daniel's favor by vacating the judgment, Daniel asks this court to review the following additional issues, which he contends were either incorrectly resolved or left unresolved by the ICA:[2]

> (1) Whether summary judgment is precluded where contradictory declarations by [the] representatives of [a] foreclosing party undercut the trustworthiness of [its] offered business records; and
>
> (2) Whether a foreclosing plaintiff[,] who is not a holder in due course[,] is subject to [a defendant's] affirmative defenses[.]

We hold that the ICA erred with respect to both of those issues, and that Daniel would be prejudiced on remand absent this court's further review.

---

[1]  The Honorable Peter T. Cahill presided.

[2]  Daniel also asks this court to review whether the circuit court abused its discretion in denying his motion to compel discovery to determine whether Nationstar was the Note's "holder" or "holder in due course."  Because Nationstar conceded its status as "holder" in its answering brief to the ICA, we need not resolve whether the circuit court abused its discretion in this respect.

2

Although the ICA correctly held that Nationstar had not demonstrated standing to enforce Daniel's Note under Bank of America, N.A. v. Reyes-Toledo, 139 Hawaiʻi 361, 390 P.3d 1248 (2017), and vacated the circuit court's judgment on this basis, we conclude that the ICA erred in holding that Nationstar's business records were trustworthy under the business records exception to hearsay. See Hawaiʻi Rules of Evidence (HRE) Rule 803(b)(6) (2002). In light of Nationstar's failure to adequately explain material discrepancies in its business records and its presentation of contradictory declarations regarding which of several versions of the Note was the "wet-ink" original, the ICA should have vacated the circuit court's order on this ground, as well.

We also conclude that Daniel's affirmative defenses should have been addressed by the circuit court, given that Nationstar, which neither pled nor proved its status as the Note's "holder in due course," was simply the Note's "holder." The ICA did not clarify this, despite the circuit court's inaccurate conclusion that "holders" were not subject to obligors' affirmative defenses. See Hawaiʻi Revised Statutes (HRS) § 490:3-305 (2008).

We therefore affirm the ICA's Judgment on Appeal, but correct its reasoning as set forth below, and remand the case for further proceedings consistent with this opinion.

3

## I. BACKGROUND

**A.    Factual Background**[3]

In 2002, Daniel and his younger brother, Marcus, inherited their family home in Kīhei, Maui ("Kanahele home" or "the property").  Daniel resided in the home, while Marcus lived in Florida.  Daniel agreed to provide Marcus with financial assistance in 2006.  Accordingly, the brothers contacted Linda Austin (Austin), a mortgage broker with Maui Mortgage Professionals, to assist them in obtaining a loan and in using their home as collateral.

According to Daniel, the primary purpose of the loan was to provide financial assistance to Marcus in his business pursuits.  Austin allegedly knew that Daniel, who had worked most of his life as an unskilled worker, was unemployed at the time he and his brother sought the loan.  Despite this, Austin represented to Daniel and his brother that because Daniel was the owner-occupant of the property, he would qualify for the loan if he provided his credit score, "without having to provide any documentation regarding assets or income[.]"

Daniel executed a Note to Lehman Brothers Bank, FSB (Lehman Brothers) for $625,000 on December 4, 2006, and was told

---

[3]    For the purposes of this section, we accept the facts asserted in Daniel's declarations as true, including Daniel's statements explaining the circumstances under which he obtained the loan.  See Crichfield v. Grand Wailea Co., 93 Hawai'i 477, 483, 6 P.3d 349, 355 (2000) (explaining that, for the purposes of summary judgment, the court "must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion" and that any doubt should be resolved in favor of the non-moving party).  All other facts in this section were taken from the record on appeal and are otherwise undisputed by the parties.

that the documents would be sent to Marcus in Florida.  The Note was secured by a mortgage, executed by the two brothers as mortgagors, in favor of Mortgage Electronic Registration Systems, Inc. (MERS) for Lehman Brothers.  The mortgage, which encumbered the Kanahele home, was recorded in the Bureau of Conveyances.

The loan went into default in 2008.  The mortgage was assigned from MERS to Aurora Loan Services (Aurora) in 2009, and in June of that year, Aurora mailed the brothers notices of default.

On August 14, 2012, Daniel sent Nationstar, the loan's servicer at the time, a Fair Debt Collection Practices Act request.  By letter dated August 27, 2012, Nationstar's customer care specialist, Joyce Lawrence (Lawrence), responded that Wells Fargo Bank owned the Note.  She also sent Daniel a copy of the Note, which had two indorsements.  The Note was first indorsed from Lehman Brothers to Lehman Brothers Holding, and second, indorsed from Lehman Brothers Holding to Aurora.[4]

---

[4]     The indorsement stamps read as follows:

Pay To The Order Of
Lehman Brothers Holding Inc.
Without Recourse
Lehman Brothers Bank, FSB
By: [signature]
E. Todd Whittemore
Vice President

PAY TO THE ORDER OF
AURORA LOAN SERVICES LLC
WITHOUT RECOURSE
LEHMAN BROTHERS HOLDING INC.
BY: [signature]
PAUL E. SVEEN
AUTHORIZED SIGNATORY

The mortgage was subsequently assigned from Aurora to Nationstar for unspecified "good and valuable consideration" on September 20, 2012. On an unspecified date, the Note was indorsed from Aurora to blank, by Nationstar as Aurora's attorney-in-fact.

Marcus died in 2013, having never signed the Note. Daniel thus explained the unique circumstances of the loan and mortgage as follows:

> It was only when the litigation began in this case [that] I learn[ed] that I was the only borrower – that my brother [had] never signed the [N]ote. As the mortgage stated us as "co-borrowers" on the signature lines of the mortgage, I had no idea that my brother was not a co-borrower. I was totally surprised and shocked to learn this.
>
> Suffice it to say, it had always been our practice to be co-borrowers when our family house was used as collateral, and it was our stated intention with Ms. Austin and the bank that we were going to be co-borrowers. I would never have agreed to the loan had I known that I was the sole borrower and that I would have been responsible for any "deficiency judgment[,]" the benefits of which went to my brother and his business and did not involve me.

In other words, Daniel "would never have agreed" to obtain the loan had he known he would be the Note's sole borrower, because the purpose of the loan was to benefit Marcus.

**B.    Procedural Background[5]**

**1.    Circuit Court Proceedings**

**a.    The Complaint**

Nationstar filed a Complaint to Foreclose against

Daniel, and Marcus's Estate, on October 7, 2014, with the

following attachments:  (1) a copy of the Note; (2) a

verification attesting that the Note was the original; and (3) an

attorney affirmation attesting the same.

Like the Note Nationstar had provided to Daniel in

2012, this Note also had two indorsements.  While the first

indorsement was identical to that of the Note that Daniel

received in 2012 – from Lehman Brothers to Lehman Brothers

Holding – the second was executed by Lehman Brothers Holding to

in-blank, rather than to Aurora.[6]

The verification, executed by Jesslyn Williams

---

[5]    This case has a long and complicated procedural history.  Because many of the previous proceedings do not materially affect the analysis, we do not address them in this opinion.

[6]    The indorsements read as follows:

Pay To The Order Of
Lehman Brothers Holding Inc.
Without Recourse
Lehman Brothers Bank, FSB
By: [signature]
E. Todd Whittemore
Vice President

PAY TO THE ORDER OF

_____
WITHOUT RECOURSE
LEHMAN BROTHERS HOLDING INC.
BY: [signature]
PAUL E. SVEEN
AUTHORIZED SIGNATORY

(Williams), Nationstar's assistant secretary, stated that:  (1) Williams had personally reviewed the documents and records in Nationstar's possession related to the case for accuracy; (2) the records and files she had reviewed were kept by Nationstar in its ordinary course of business and were made at or near the time of such acts; and (3) Nationstar possessed the original Note, indorsed-in-blank.  Lloyd T. Workman (Workman), Nationstar's counsel at that time, also attested that the documents Nationstar had submitted to the circuit court were accurate and that they "contained no false statements of fact or law."[7]

**b.    Nationstar's First Motion for Summary Judgment and Related Proceedings**

Nationstar filed its first Motion for Summary Judgment on March 30, 2015, alleging that it had adequately established its ability to foreclose on the Kanahele home.  Nationstar attached the same Note to its Motion as it attached to its Complaint, as well as a declaration by Demetrice Person (Person), one of Nationstar's document execution specialists.

---

[7]    In relevant part, Workman declared:

Based upon the communications from Jesslyn Williams, as well as upon my own inspection and other reasonable inquiry under the circumstances, which included a review of copies of the loan documents and other communications with Plaintiff's representatives, I affirm that, to the best of my knowledge, information, and belief, the Summons, Complaint, and other papers filed or submitted to this Court in this matter contain no false statements of fact or law, and that it is my belief based upon a good faith inquiry, that Plaintiff has legal standing to bring this foreclosure action.  I understand my continuing obligation to amend this Affirmation in light of newly discovered material facts following its filing.

8

Just like Williams had done in her verification, Person attested that:  (1) she had personally reviewed the documents and records in Nationstar's possession related to Daniel's case for accuracy; (2) the records and files she had reviewed were kept by Nationstar in its ordinary course of business and were made at or near the time of such acts; and (3) Nationstar possessed the original Note, which had two indorsements, one of which was indorsed-in-blank.

In his opposition memorandum, Daniel argued that summary judgment would be inappropriate because:  (1) genuine issues of material fact existed as to who owned the Note, in light of Nationstar's presentation of two different versions of the Note; and (2) Nationstar, which had neither pled nor proven its status as a "holder in due course," had not yet addressed Daniel's affirmative defenses.

### c. Nationstar's Renewed Motion for Summary Judgment and Related Proceedings

Nationstar withdrew its first Motion for Summary Judgment to "address [the] issues raised by Daniel," and filed its Renewed Motion for Summary Judgment on December 15, 2015. Attached to Nationstar's new motion was a Note with three indorsements, rather than two, as well as two more declarations affirming that this Note accurately reflected the original.  Like the Note presented to Daniel in 2012, the Note's first indorsement was from Lehman Brothers to Lehman Brothers Holding and the second indorsement was from Lehman Brothers Holding to

Aurora.  The Note's third indorsement, however, had been indorsed in-blank from Aurora, by Nationstar as Aurora's attorney-in-fact.[8]

To support this version of the Note, Nationstar submitted a declaration executed by Toni Vincent (Vincent), a document execution specialist, which stated that:  (1) Vincent had personally reviewed the documents and records in Nationstar's possession related to Daniel's case including a "current copy of the original Note," which was indorsed-in-blank and attached to Nationstar's new motion; (2) the records and files were incorporated and kept by Nationstar in its ordinary course of business and verified for their accuracy; and (3) the Note was in the possession of and ha[d] been maintained by Nationstar since

---

[8]    The indorsements read as follows:

Pay To The Order Of
Lehman Brothers Holding Inc.
Without Recourse
Lehman Brothers Bank, FSB
By: [signature]
E. Todd Whittemore
Vice President

PAY TO THE ORDER OF
AURORA LOAN SERVICES LLC
WITHOUT RECOURSE
LEHMAN BROTHERS HOLDINGS INC.
BY: [signature]
PAUL E. SVEEN
AUTHORIZED SIGNATORY

Pay to the Order of
_____
Without Recourse
Aurora Loan Services LLC by Nationstar
Mortgage LLC Its Attorney-In-Fact
By [signature]
Assistant Secretary
Julie Martinez

10

before the commencement of th[e] case."

Vincent further declared that she had reviewed Person's declaration submitted with Nationstar's first Motion for Summary Judgment, had conferred with Person, and could confirm that Person's declaration was inaccurate because Person had not followed Nationstar's policies and procedures, had not personally reviewed the "original 'wet-ink' Note," and had attached an outdated copy of the Note to the first motion that "did not contain all of the indorsements currently set forth on the original Note."[9] David Rosen, Nationstar's counsel at the time,

_____

[9] In relevant part, Vincent's declaration stated:

15. On March 10, 2015, Demetrice Person ("Person"), a Document Execution Specialist at Nationstar, executed a Declaration in Support of Plaintiff's Motion for Summary Judgment ("MSJ Declaration") which was filed in the above-captioned case on March 30, 2015.

16. The MSJ Declaration included inaccurate information regarding the Loan because Person failed to comply with Nationstar's Declaration Policies and Procedures. Specifically, the MSJ Declaration inaccurately stated that: (1) Person "personally reviewed the original wet-ink [Note] [sic] dated December 4, 2006"; and (2) "[a] true and correct copy of the original Note is attached [to the MSJ Declaration] as Exhibit A".

17. In fact, Person did not review the original "wet-ink" Note. Rather, Person reviewed an outdated copy of the Note which did not contain all of the indorsements currently set forth on the original Note.

18. Also, the copy of the Note included as Exhibit A as to the MSJ Declaration was not a true and correct copy of the original Note. Again what was provided was an outdated copy of the Note, which did not contain all of the indorsements currently set forth on the original Note.

19. My personal knowledge of these statements is

(continued...)

11

also attested via declaration that <u>this</u> Note, with its three indorsements, was the "original 'wet-ink' Note."

Daniel then filed his own Motion for Summary Judgment, raising similar arguments to those raised before. Specifically, Daniel contended that Nationstar had not "produced admissible evidence establishing [the] elements of a remedy of foreclosure[,]" and further, that it had not addressed Daniel's affirmative defenses.

On March 14, 2016, the circuit court issued findings of fact and conclusions of law, entered an order granting Nationstar's Renewed Motion for Summary Judgment, and entered final judgment in Nationstar's favor. The circuit court concluded that Nationstar, as "holder" of Daniel's Note, had adequately proven its ability to foreclose on the mortgage.

---

[9](...continued)
derived from my having inspected a copy of the MSJ Declaration, the Exhibits thereto, a current copy of the original Note, and my having conferred with Person regarding this matter.

20. I, in my role as manager at Nationstar, am responsible for managing Person. As such, I can confirm that after Nationstar discovered that the MSJ Declaration contained inaccurate information, Nationstar: (1) re-trained Person on Nationstar's Declaration Policies & Procedures to ensure that Person understands what she must do to verify the accuracy of information contained in a declaration and to verify that the exhibits to a declaration are true and correct copies of said documents; and (2) conducted an audit of the work Person completed in the 90 days immediately prior to discovering the inaccuracies contained in the MSJ Declaration to ensure that no other mistakes were made by Person.

(emphases in original).

12

## 2. ICA Proceedings

On appeal, Daniel argued that summary judgment was improper in light of the untrustworthiness of Nationstar's business records and Nationstar's failure to address Daniel's affirmative defenses when it was "holder" of the Note. Nationstar, on the other hand, despite conceding its status as "holder," rather than "holder in due course," denied that its business records were untrustworthy, and further claimed that Daniel's affirmative defenses lacked merit.[10] As such, Nationstar argued that summary judgment was proper.

The ICA's memorandum opinion vacated the circuit court's final judgment and remanded the case for further proceedings. Despite rejecting Daniel's argument that the Note with three indorsements lacked indicia of trustworthiness for admissibility under HRE Rule 803(b)(6), the ICA concluded that Nationstar had not established its standing to enforce the Note under Reyes-Toleldo, 139 Hawai'i 361, 390 P.3d 1248.

As a preliminary matter, the ICA concluded that Nationstar's business records were admissible under HRE Rule 803(b)(6). After examining HRE Rule 803(b)(6) and its commentary, Vincent's declaration, and this court's rulings in U.S. Bank N.A. v. Mattos, 140 Hawai'i 26, 398 P.3d 615 (2017),

---

[10] Specifically, Nationstar stated in its Answering Brief that "Mr. Kanahele ignores the fact that Nationstar denied it was a holder in due course but stated that it [was] the holder of the Note. As discussed above, Nationstar's status as a "holder in due course" is not at issue[.]" (emphasis in original).

13

and <u>Wells Fargo Bank, N.A. v. Behrendt</u>, 142 Hawaiʻi 37, 414 P.3d 89 (2018), the ICA also concluded that Nationstar's business records were trustworthy.

According to the ICA, Person's declaration had no impact on the third Note's admissibility, despite contradicting Vincent's declaration. The ICA explained that while Person's "inaccurate declaration" may have bore on her own credibility, it did "not necessarily [bear] on the reliability" of Nationstar's record-keeping system or business records, which the court explained, was the "focus" of the trustworthiness requirement.

The ICA further explained that Nationstar's business records were trustworthy under <u>Mattos</u>, 140 Hawaiʻi 26, 398 P.3d 615, and <u>Behrendt</u>, 142 Hawaiʻi 37, 414 P.3d 89, because unlike the declarants in those cases, here, Vincent provided enough information in her declaration to establish herself as a qualified witness of Nationstar's business records. More specifically, the ICA found that unlike the declarations in <u>Mattos</u> and <u>Behrendt</u>, Vincent's declaration established that:

> Nationstar (1) received the loan documents, including the Note, from prior loan servicers and incorporated them into its records; and (2) that once integrated Nationstar "relie[d] on these business records in the ordinary course of its mortgage loan servicing business." And as stated above, Vincent provided additional facts sufficient to establish the trustworthiness of the documents attached to her declaration.

The ICA concluded the trustworthiness requirement had also been satisfied given that Nationstar did not rely on Person's declaration to establish the elements of its claim, and

14

given Vincent's explanation that her declaration was submitted to correct Person's misstatements and the misinformation presented in Nationstar's previous motion for summary judgment. The ICA also concluded that Nationstar's 2012 letter, which indicated that Wells Fargo owned the Note, was inapposite because the "issue [here] [was] whether Nationstar was the holder at the time of the filing of the Complaint, not the identity of the owner two years ago."

Regardless, the ICA found that Nationstar had not adequately established standing to foreclose under the requirements of Reyes-Toledo, 139 Hawai'i 361, 390 P.3d 1248. The ICA pointed out that, as in Reyes-Toledo,

> the copy of the Note attached to the Vincent declaration and the Renewed Motion for Summary Judgment [did] not reflect the date of the blank indorsement. . . . Although Vincent declared that "the Note was in the possession of and ha[d] been maintained by Nationstar since before the commencement of this case," she did not attest that the Note was indorsed-in-blank prior to the commencement of this case or that the copy attached reflect[ed] the indorsements as they existed when the Complaint was filed.

Consequently, the ICA vacated the circuit court's order and judgment, and declared that on remand, in order to have standing to enforce the Note, Nationstar would have to show that it possessed the Note prior to commencing its action against Daniel in 2014. The ICA did not address Daniel's affirmative defenses, and also did not address Nationstar's acknowledgment, in its appellate briefing, of its status as "holder" of the Note. The ICA's Judgment on Appeal was entered on September 25, 2018.

15

## II. STANDARDS OF REVIEW

A.    **Summary Judgment**

This court reviews "the circuit court's grant or denial of summary judgment de novo." Querubin v. Thronas, 107 Hawaiʻi 48, 56, 109 P.3d 689, 697 (2005) (citation omitted). Accordingly, "summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." Iddings v. Mee-Lee, 82 Hawaiʻi 1, 5, 919 P.2d 263, 267 (1996); see also Hawaiʻi Rules of Civil Procedure (HRCP) Rule 56(c) (2000).[11]

On a motion for summary judgment, "a 'genuine issue as to any [material] fact' . . . [in] a conflict in the affidavits as to a particular matter must be of such a nature that it would affect the result." Richards v. Midkiff, 48 Haw. 32, 39, 396 P.2d 49, 54 (1964) (citation omitted). Furthermore, "[a]ffidavits in support of a summary judgment motion [must be] scrutinized to determine whether the facts they aver are admissible at trial and are made on the personal knowledge of the affiant." Adams v. CDM Media USA, Inc., 135 Hawaiʻi 1, 28, 346

---

[11]     HRCP Rule 56(c) provides, in relevant part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

P.3d 70, 97 (2015) (internal quotation marks omitted) (quoting Miller v. Manuel, 9 Haw. App. 56, 66, 828 P.2d 286, 292 (1991)).

In reviewing a circuit court's grant or denial of a motion for summary judgment, the appellate court "must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion" and any doubt should be resolved in favor of the non-moving party. Crichfield v. Grand Wailea Co., 93 Hawaiʻi 477, 483, 6 P.3d 349, 355 (2000) (internal quotation marks, brackets, and citation omitted).

Similarly,

> [A] party moving for summary judgment is not entitled to a judgment merely because the facts he offers appear more plausible than those tendered in opposition or because it appears that the adversary is unlikely to prevail at trial. This is true even though both parties move for summary judgment. Therefore, if the evidence presented on the motion is subject to conflicting interpretations, or reasonable men might differ as to its significance, summary judgment is improper.

Makila Land Co., LLC v. Kapu, 114 Hawaiʻi 56, 67, 156 P.3d 482, 493 (App. 2006) (citation omitted).

## B.    The Admissibility of Evidence under HRE Rule 803(b)(6)

"Where admissibility of evidence is determined by application of the hearsay rule, there can only be one correct result, and the appropriate standard for appellate review is the right/wrong standard." State v. Fitzwater, 122 Hawaiʻi 354, 362, 227 P.3d 520, 528 (2010) (internal quotation marks and citation omitted). Thus, we review the admissibility of business records under HRE Rule 803(b)(6) pursuant to the right/wrong standard.

17

However, when "the trial court [] base[s] its ruling [of admissibility] on the 'judgment call' of whether the sources of information or other circumstances [related to the records] indicate[] a lack of trustworthiness," we review for abuse of discretion.  State v. Jhun, 83 Hawai'i 472, 477 n.4, 927 P.2d 1355, 1360 n.4 (1996).

## C.    Statutory Interpretation

The interpretation of a statute is a question of law that appellate courts review de novo.  Sierra Club v. Dep't of Transp., 120 Hawai'i 181, 197, 202 P.3d 1226, 1242 (2009).  "[W]here the terms of a statute are plain, unambiguous[,] and explicit, . . . our sole duty is to give effect to the statute's plain and obvious meaning."  Bhakta v. Cnty. of Maui, 109 Hawai'i 198, 208, 124 P.3d 943, 953 (2005) (internal quotation marks and citation omitted).

## III.  DISCUSSION

**A.    The ICA Erred in Concluding that Nationstar's Third Note was Admissible Under HRE Rule 803(b)(6) Because the Sources of Information and Other Circumstances Surrounding the Note Indicated the Note's Lack of Trustworthiness**

HRE Rule 803(b)(6) provides that the following are not excluded by the hearsay rule:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made in the course of a regularly conducted activity, at or near the time of the acts, events, conditions, opinions, or diagnoses, as shown by the testimony of the custodian or other qualified witness, or by certification that complies with rule 902(11) or a statute permitting certification, unless the sources of information or other circumstances indicate lack of trustworthiness.

18

(emphasis added).

The commentary to HRE Rule 803(b)(6) further provides that:

> The hallmark of reliability in this area is not the nature of the business or activity but rather its "regularity and continuity which produce habits of precision, [the] actual experience of [the] business in relying upon [the records], [and the] duty to make an accurate record as part of a continuing job or occupation." A further safeguard is that preliminary determination of the trustworthiness of such records is discretionary with the courts.

(emphasis added).

The ICA concluded that Nationstar's Note with three indorsements bore the requisite indicia of trustworthiness as required under Mattos and Behrendt because Vincent's declaration established "that [(1)] Nationstar [] received the loan documents, including the Note, from prior loan servicers and incorporated them into its records; [] (2) that once integrated[,] Nationstar 'relie[d] on th[o]se business records in the ordinary course of its mortgage loan servicing business[,]'" and that "Vincent provided additional facts sufficient to establish the trustworthiness of the documents attached to her declaration."

While satisfying the requirements of Mattos and Behrendt is necessary to lay a foundation for admissibility under HRE Rule 803(b)(6) with regard to being a qualified witness who may testify as to the reliability of the records at issue, these requirements are not sufficient to show trustworthiness on their

19

own when the totality of circumstances indicate the opposite.

In light of Vincent's declaration, the conflicting attestations of Williams, Workman, and Person, and Nationstar's failure to explain Lawrence's 2012 assertion that Wells Fargo owned the Note, the indicia of trustworthiness required for the Note's admissibility under HRE Rule 803(b)(6) were not present, despite the fact that Vincent may have been a qualified witness with respect to the records under Mattos and Behrendt.

Furthermore, in Hawai'i, an affidavit submitted by a party in support of a motion for summary judgment must be based on the affiant's personal knowledge. Adams, 135 Hawai'i at 28, 346 P.3d at 97. In other words, the affidavit must adequately reflect that the affiant (1) perceived the event about which they testified; and (2) had a present recollection of that perception. See id.; HRE Rule 602 (1992);[12] HRCP Rule 56(e).[13] Affidavits

---

[12] The commentary to HRE Rule 602 (personal knowledge) provides in relevant part:

> This rule, which is identical with Fed. R. Evid. 602, restates the traditional common-law rule barring a witness from testifying to facts of which he has no direct personal knowledge. See McCormick § § 10, 11. "Personal knowledge," for purposes of this rule, means that the witness perceived the event about which he testifies and that he has a present recollection of that perception. The personal knowledge requirement should not be confused with the hearsay ban, see Rule 802 infra.
>
> In fact, the requirements of Rule 602 apply to a hearsay statement admitted under any of the hearsay exception rules, 802.1, 803, and 804 infra, in that admissibility of a hearsay statement is predicated on the foundation requirement of the witness' personal knowledge of the making of the statement itself. Evidence of personal knowledge is a general foundation

(continued...)

20

that state ultimate or conclusory facts or conclusions of law may not be used to support a motion for summary judgment. <u>Adams</u>, 135 Hawai'i at 30, 346 P.3d at 99 (citation omitted).

Here, Vincent's declaration was not based on personal knowledge. Vincent attested that Person's declaration "included inaccurate information regarding the loan because Person failed to comply with Nationstar's Declaration Policies and Procedures," that Person "reviewed an outdated <u>copy</u> of the Note," rather than the "original wet-ink Note," and that Vincent's "personal knowledge of these statements was derived from [] having inspected a copy of [Person's declaration], the Exhibits thereto,

---

(...continued)
      <u>requirement for admissibility of all evidence</u>, subject to Rule 703 relating to expert witnesses.

 (emphasis added).

[13]    HRCP Rule 56 (Summary judgment) provides in relevant part:

(e)    Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits <u>shall be made on personal knowledge</u>, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, <u>but the adverse party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial</u>. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

 (emphases added).

21

a current copy of the original Note, and [] having conferred with Person[.]"

It is clear that Vincent did not personally observe Person reviewing the "outdated copy of the Note" or Person's failure to review the "the original wet-ink Note." Rather, Vincent based her statement that Person "reviewed an outdated copy of the Note" on communications she had with Person.[14] "Were we to dilute the requirement that affidavits be based on personal knowledge, it [would] be all [too] easy to come up with hearsay affidavits effectively undermining the entire summary judgment process." Midland Funding, LLC v. Trahan, 110 So.3d 1154, 1157-58 (La. Ct. App. 2013) (citation omitted).

Given that Vincent's attestation to Person's errors was not based on Vincent's personal knowledge, those portions of her declaration should not have been relied upon by the circuit court in ruling on Nationstar's Renewed Motion for Summary Judgment. Furthermore, without those portions, the declaration merely attested, based on Vincent's own review of Nationstar's documents, that the Note attached to her declaration was "the current copy of the original Note[.]" This, however, was in direct conflict with Person's declaration, which stated that the version of the Note that she attested to was "the current copy of the original Note[,]" as well as the attestations of Williams and

_____

[14] Person's statements to Vincent would appear to be inadmissible hearsay. However, because Daniel did not object to the admission of Vincent's declaration on this ground, we do not address this issue further.

22

Workman.  The ICA thus erred in concluding that Vincent's declaration was more credible than any other, and that, on this basis, summary judgment was appropriate.

We clarify, however, that not all mistakes, or allegations of mistake, in a company's business records will render that company's record-keeping practices untrustworthy, and therefore render their records inadmissible.  In State v. Forman, the ICA held that "the vague testimony that [a company] 'kept bad paperwork,' without more, [did] not warrant a conclusion that the company's records as a whole were untrustworthy[,]" and further, that the "application of the business records rule" could not be avoided on the basis "that a regular practice is occasionally broken."  125 Hawaiʻi 417, 424-25, 263 P.3d 127, 134-35 (App. 2011) (citing United States v. McGill, 953 F.2d 10, 15 (1st Cir. 1992) (explaining that to hold otherwise, the business records rule would be "swallowed up by an exception for less-than-perfect business practices")).  Unlike in Forman, however, Daniel did not make bald allegations of Nationstar's "bad paperwork" practices, but rather, pointed to specific, material contradictions that Nationstar either did not address, or addressed inadequately.

If, in fact, the Note with three indorsements was the true and correct version of the Note, then Person should have submitted a new declaration in support of Nationstar's Renewed Motion for Summary Judgment, acknowledging that for the purposes of her first declaration, she had reviewed an "outdated copy of the Note" rather than the "original wet-ink Note."  These

23

statements, from Person, rather than from Vincent, would have demonstrated the requisite personal knowledge as required for affidavits submitted to support summary judgment motions.

Nationstar incorrectly points to Cordeiro v. Burns, 7 Haw. App. 463, 776 P.2d 411 (1989), to support its contention that Person's and Vincent's declarations were consistent with each other, rather than in conflict.  This reliance is misplaced, however, because in Cordeiro, Burns himself explained why his statements, which on their face seemed contradictory, were not. Id. at 470, 776 P.2d at 417.  In other words, Burns offered a plausible explanation for why he gave inconsistent statements based on his own personal knowledge.  Id.  Presumably, Person could have done the same.  As such, Person should have been the one to explain why her first declaration was incorrect, if indeed, it was.

In sum, despite the fact that Vincent constituted a qualified witness under Mattos and Behrendt, the Note with three indorsements was not admissible as a business record under HRE Rule 803(b)(6) because the circumstances surrounding the Note indicated a lack of trustworthiness.  Nationstar could have avoided this problem if its prior affiants had submitted new affidavits explaining why and how they had erred before, and further, if Nationstar had addressed why it had stated that the Note belonged to Wells Fargo in 2012.  Nationstar, however, did neither.  Accordingly, Nationstar's motion for summary judgment should have been denied, not only on the ground of standing, but

24

also on the basis of trustworthiness.

**B.     If Nationstar Establishes its Standing to Enforce the Note on Remand, it will be Required to Address Daniel's Affirmative Defenses as the Note's "holder"**

The circuit court concluded that Daniel could not assert his affirmative defenses against "the people who are now holder" of the Note.[15]  The circuit court, however, mischaracterized the law by extending the legal protections afforded to "holders in due course" to "holders."  We clarify that unless a foreclosing party can establish itself as a "holder in due course," it will be considered a "holder" subject to all of an opposing party's affirmative defenses.

Pursuant to HRS § 490:3-302 (2008), in order to be considered a "holder in due course," a foreclosing party must demonstrate that:

> (1) The instrument when issued or negotiated to the holder [did] not bear such apparent evidence of forgery or alteration or [was] not otherwise so irregular or incomplete as to call into question its authenticity; and
>
> (2) The holder took the instrument (i) for value, (ii) in good faith, (iii) without notice that the instrument [was] overdue or ha[d] been dishonored or that there [was] an uncured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contain[ed] an unauthorized signature or ha[d] been altered, (v) without notice of any claim to the instrument described in section 490:3-306, and (vi) without notice that any party ha[d] a defense or claim in recoupment described in section 490:3-305(a).

HRS § 490:3-302(a).

---

[15]     Daniel's affirmative defenses, raised before the circuit court, included, <u>inter alia</u>, fraud in the inducement, unconscionability, and mistake.

25

The commentary to HRS § 490:3-302 further provides that "[t]he primary importance of the concept of holder in due course is with respect to [the] assertion of defenses or claims in recoupment (Section 3-305)[16] and of claims to the instrument

---

[16]    HRS § 490:3-305 (Defense and claims in recoupment) provides in relevant part:

>    (a)    Except as stated in subsection (b), the right to enforce the obligation of a party to pay the instrument is subject to the following:
>
>        (1)    A defense of the obligor based on (i) infancy of the obligor to the extent it is a defense to a simple contract, (ii) duress, lack of legal capacity, or illegality of the transaction which, under other law, nullifies the obligation of the obligor, (iii) fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms, or (iv) discharge of the obligor in insolvency proceedings;
>
>        (2)    A defense of the obligor stated in another section of this article or a defense of the obligor that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract; and
>
>        (3)    A claim in recoupment of the obligor against the original payee of the instrument if the claim arose from the transaction that gave rise to the instrument; but the claim of the obligor may be asserted against a transferee of the instrument only to reduce the amount owing on the instrument at the time the action is brought.
>
>    (b)    The right of a holder in due course to enforce the obligation of a party to pay the instrument is subject to defenses of the obligor stated in subsection (a)(1), but is not subject to defenses of the obligor stated in subsection (a)(2) or claims in recoupment stated in subsection (a)(3) against a person other than the holder.

(continued...)

(Section 3-306)."[17]  With respect to defenses and claims in recoupment, "[i]f a defense or claim in recoupment is proved," the plaintiff's right to payment is subject to that defense or claim, "except to the extent the plaintiff proves that [it] has rights of a holder in due course which are not subject to [that] defense or claim."  HRS § 490:3-308(b) (2008); Reyes-Toledo, 139 Hawai'i at 367, 390 P.3d at 1254 (acknowledging HRS § 490:3-308 and its commentary).  "Until proof of a defense or claim in recoupment is made, the issue as to whether the plaintiff has rights of a holder in due course does not arise."  HRS § 490:3-308 cmt. 2.

Pursuant to HRS § 490:3-305, "holders in due course," like "holders," are subject to an obligor's "real defenses"[18] against an instrument, which include:  (1) infancy; (2) duress, lack of legal capacity, or illegality of the transaction; (3)

_____

(...continued)
        (emphases added).

[17]     HRS § 490:3-306 (2008) (Claims to an instrument) provides:

        A person taking an instrument, other than a person
        having rights of a holder in due course, is subject to
        a claim of a property or possessory right in the
        instrument or its proceeds, including a claim to
        rescind a negotiation and to recover the instrument or
        its proceeds.  A person having rights of a holder in
        due course takes free of the claim of the instrument.

        (emphasis added).

[18]     A "real defense" is "good against any possible claimant," including holders and holders in due course.  Black's Law Dictionary 512 (10th ed. 2014).  In contrast, a "personal defense" is "[a]n ordinary defense in a contract action . . . that the maker or drawer of a negotiable instrument is precluded from raising against a person who has the rights of a holder in due course."  Id.

27

fraud that induced the obligor to sign the instrument without knowing its terms and without reasonable opportunity to find them out; and (4) discharge of the obligor through insolvency proceedings.  See HRS § 490:3-305(a)(1); see also HRS § 490:3-305 cmt. 1 (explaining that subsection (a)(1) pertains to "real defenses").

Unlike "holders," however, "holders in due course" are not subject to an obligor's "personal defenses," when those defenses are against the original obligee.  HRS § 490:3-305(a)(2)-(3); White, Summers, & Hillman, Uniform Commercial Code § 18:29 (6th ed. 2010).[19]  In other words, one of the advantages of being a "holder in due course" is the special protection it provides against an obligor's personal defenses against another.

In conclusion, if Nationstar can prove on remand that it possessed the Note with three indorsements prior to filing its Complaint, it will establish its standing to enforce the Note under Reyes-Toledo.  However, Nationstar conceded its status as

_____

[19]    White, Summers, and Hillman explain:

> The defenses of the obligor can be summed up neatly as follows: [they are] all defenses provided elsewhere in Article 3 and all defenses that would be available to the obligor against a person who was attempting to enforce the instrument as a simple contract, that is to say, at common law.  By tradition, the defenses from which a holder in due course takes free are called "personal defenses" and include[, inter alia,] failure or lack of consideration, breach of warranty, unconscionability, and garden variety fraud (fraud in the inducement).  Recall that a holder in due course does not necessarily take free of all "personal" defenses.  Rather, the holder in due course is sure to take free only of the personal defenses that do not arise from his own behavior.

White, Summers, and Hillman, Uniform Commercial Code § 18:29 (6th ed. 2010).

28

"holder" (rather than as "holder in due course") of Daniel's Note in its ICA briefing. As a "holder," it will be required on remand to respond to Daniel's affirmative defenses that were personal in nature. Lastly, if the case proceeds to trial, discovery should be permitted to the extent that it may help Daniel develop his defenses.

## IV. CONCLUSION

We affirm the ICA's September 25, 2018 Judgment on Appeal, which vacated the circuit court's March 14, 2016 Judgment on Foreclosure Decree and remanded the case for further proceedings, subject to the clarifications set forth above.

| | |
|---|---|
| Lance D. Collins<br>(Bianca K. Isaki with<br>him on the briefs)<br>for petitioner | /s/ Mark E. Recktenwald<br><br>/s/ Paula A. Nakayama |
| | /s/ Sabrina S. McKenna |
| David A. Nakashima<br>for respondent | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |

